UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | Case No. 4:09-CV-298-EJL |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| DAVID ROSENKRANCE, Field Manager, Challis Field Office; and BUREAU OF LAND MANAGEMENT, | |
| Defendants. | |

## INTRODUCTION

Western Watersheds Project ("WWP") challenges the United States Bureau of

Land Management and Field Manager David Rosenkrance (together "BLM" or

"Defendants") for decisions to grant several livestock grazing permits. WWP claims

BLM violated the National Environmental Policy Act ("NEPA") because the

Environmental Assessment ("EA") on which BLM based its decision is deficient in three

respects: (1) it failed to take a "hard look" at impacts on bull trout, an Endangered

Species Act ("ESA") listed species; (2) it failed to consider a reasonable number of

alternatives; and (3) it failed to analyze the cumulative impacts of the proposed action.

WWP's complaint also alleged violations of the Federal Land Policy and Management Act; however, WWP has elected to pursue only the NEPA claims. BLM maintains it complied with NEPA in granting the contested grazing permits.

Both sides have moved for summary judgment. BLM has also moved to supplement the administrative record. The Court has reviewed the parties' briefing and the administrative record, and has determined that oral argument will not significantly aid in this decision. For the reasons discussed below, the Court will grant summary judgment for WWP and will deny BLM's cross motion for summary judgment and motion to supplement the record.

## BACKGROUND

In 2007 and 2008, BLM prepared an EA to evaluate several applications for new ten-year grazing permits on public land in Idaho's Pahsimeroi River valley. (A.R 1885–87, Dkt. No. 13.) Specifically, the EA considered renewed grazing on four BLM allotments: Grouse Creek, Trail Creek, Meadow Creek, and Rock Creek. (A.R. 1886.) The first three allotments, at the northeastern base of the Lost River mountain range, are contiguous and separated from Rock Creek by other BLM and U.S. Forest Service allotments and by National Forest land. (Ex. A., Decl. Kathleen Fite, Dkt. No. 20-1.) Rock Creek is further to the south and spans a portion of the upper Pahsimeroi River. (*Id.*)

## 1. BLM's Environmental Assessment

### A. *Alternatives Considered*

BLM considered three alternatives in its EA, all of which included comparable levels of grazing; no alternative considered no grazing or limited grazing. (A.R. 1895–08.) Alternative One, the Proposed Action, was "based on the concerns of the permittees for livestock management and to renew/modify their [expiring] 10 year term grazing permits." (A.R. 1895.) The Proposed Action provided for 826 animal unit months ("AUMs")[1] on Grouse Creek (A.R. 1895), 275 AUMs on Trail Creek (A.R. 1897), 240 AUMs on Meadow Creek (A.R. 1898), and 153 AUMs on Rock Creek (A.R. 1899). The Proposed Action also provided for a number of range improvements, including construction of several miles of new water pipeline. (A.R. 1896, 1898.)

Alternative Two, the "BLM-developed Alternative," proposed identical levels of grazing. (A.R. 1900, 1902–04.) Alternative Two also included some range improvements, although fewer than the Proposed Action. (A.R. 1901.) Alternative Two would allow permittees to develop a spring to fill water troughs on Grouse Creek and an adjacent allotment not considered in the EA. (A.R. 1901.) Additionally, Alternative Two's range improvements included enclosures to protect the developed spring. (A.R. 1901.) Nonetheless, the only notable difference between Alternative Two and the

---

[1] "An AUM is the amount of forage needed to sustain one cow and calf . . . or five sheep . . . for one month." Rangeland Management, http://www.blm.gov/id/st/en/prog/grazing.html (last visited Dec. 8, 2010).

Proposed Action were the actual dates of use and extent of the range improvements; the total grazing and number of grazing days remained unchanged from the Proposed Action. (Attach.1, Def.'s Object. WWP's State. Facts, Dkt. No. 30-1.)

Finally, Alternative Three—the so-called "No Action" Alternative—would have issued permits with identical terms to the prior permits. (A.R. 1904.) "There would be no changes to the mandatory terms and conditions, other terms and conditions, grazing seasons, or kind of livestock" from the expiring permits. (A.R. 1904.) Under the "No Action" Alternative, the grazing levels would be nearly identical to the Proposed Action, but one permittee would be authorized to graze sheep instead of cattle.[2] (A.R. 1905.)

**B. *Environmental Impact Analysis***

The "Affected Environment" section of the EA states that the four allotments considered "contain no threatened or endangered aquatic species." (A.R. 1908.) That

---

[2]The total AUMs proposed under the "No Action" Alternative was nearly the same as the Proposed Action. (A.R. 1905, 1906, 1907.) The "No Action" Alternative called for BLM to issue permits for the same number of AUMs on Trail Creek, Meadow Creek, and Rock Creek as would the Proposed Action. (A.R. 1906–07.) Although the "No Action" grazing levels on Grouse Creek would deviate by about 10 percent from the Proposed Action.

On Grouse Creek, the "No Action" Alternative would permit 1830 sheep AUMs and 374 cattle AUMs. (A.R. 1905.) One (1) cattle AUM is equivalent to five (5) sheep AUMs. *See* Rangeland Management, http://www.blm.gov/id/st/en/prog/grazing.html (last visited Dec. 8, 2010). So converting sheep AUMs to cattle AUMs on Grouse Creek yields a total approximate grazing level of 740 cattle AUMs. Accordingly, the "No Action" Alternative includes 86 fewer AUMs on Grouse Creek than does the Proposed Action, or a 10 percent decrease.

section goes on:

> No adverse effects to the environmental baseline were identified in the Pahsimeroi River [ESA] Section 7 Watershed [Biological Assessment ("BA")] or during consultation with [the National Marine Fisheries Service] and U.S. Fish and Wildlife Service (USFWS). The BA determined that due to the lack of listed salmonids or their habitats within the allotments and the existing grazing allowable use criteria for the allotments, livestock grazing on the allotment [sic] would have no effect on federally listed salmonids.

(A.R. 1908.) Further, that EA section includes a table that lists the presence of fish within each allotment. (A.R. 1922.) That table does not acknowledge bull trout presence. (A.R. 1922.)

The EA also notes that "[t]he Rock Creek Allotment . . . falls within the boundaries of the Burnt Creek [Wilderness Study Area or] WSA. The other three allotments being analyzed in [the EA] do not lie within any WSA's [sic]." (A.R. 1909.) WSAs are noteworthy because the BLM manages each WSA to protect its suitability for wilderness, should Congress decide to designate the area as wilderness. (A.R. 1909.)

In the "Environmental Impacts" section, the EA discusses the effects of the Proposed Action on federally listed and BLM sensitive fish species. (A.R. 1932.) Specifically, in considering the Rock Creek Allotment, the EA mentions the species of concern that occur in the upper Pahsimeroi River within that allotment. (A.R. 1933.) The EA notes "[b]ull trout have also been observed in the nearby East and West Forks of the Pahsimeroi River." (A.R. 1933.) The EA states, however, that bull trout are not present in the Rock Creek-portion of the Pahsimeroi and "[t]herefore federally protected fisheries

and associated critical habitat should not be negatively affected" by the Proposed Action. (A.R. 1933.)

Finally, that section concludes "[n]o significant direct, indirect, or cumulative impacts are expected as a result of the [P]roposed [Action]." (A.R. 1937.) The EA asserts there will be no impacts because the Proposed Action "is consistent with the guidelines for livestock grazing management and would ensure maintenance or significant progress toward meeting the six applicable standards for rangeland health from the *Idaho Standards for Rangeland Health and Guidelines for Livestock Grazing Management FINAL, 1997* for the four allotments analyzed."[3] (A.R. 1937.)

## C. *Cumulative Impacts Analysis*

The EA has a subsection entitled "Cumulative" within the "Environment Impacts" section. (A.R. 1934.) That subsection discusses BLM's scheduled Rangeland Health Assessments and BLM's changing management practices in the Pahsimeroi Valley, which began in 1993. (A.R. 1934–35.) That subsection also mentions the benefits of the range improvements in the Proposed Action: "[t]he proposed projects in three of the four allotments would improve livestock distribution within the uplands and alleviate pressure

_____

[3]"The Standards for Rangeland Health, as applied in the State of Idaho, are to be used as the [BLM's] management goals for the betterment of the environment, protection of cultural resources, and sustained productivity of the range. They are developed with the specific intent of providing for the multiple use of the public lands." Bureau of Land Mgmt., U.S. Dep't of the Interior, *Idaho Standards for Rangeland Health and Guidelines for Livestock Grazing Management FINAL* 3 (1997) *available at* http://www.blm.gov/id/st/en/prog/grazing.html. These standards and guidelines do not appear in the record; they are BLM's management goals and are distinct from NEPA and NEPA analysis.

on streams, improving riparian condition, though at the same time adding limited disturbance to the upland areas presently not receiving use." (A.R. 1935.) It also considers the potential for wildlife to move onto private land to find food in the event that livestock consume too much forage on the allotments. (A.R. 1936.) Yet the only apparent cumulative impacts discussion is one sentence: "Cumulative impacts could occur on the permittee's private land by the increase in livestock use on private lands." (A.R. 1935.)

The "Cumulative" subsection for Alternatives Two summarily states: "Cumulative impacts under this alternative would be similar to the Proposed Action." (A.R. 1941.) Similarly, the EA finds the "No Action" Alternative's "[c]umulative impacts would be similar to the Proposed Action and Alternative [Two] except that there would be no new range improvements constructed." (A.R. 1944.) The "No Action" cumulative discussion also states that prior grazing management—*i.e.*, management under the expiring permits—kept the allotments consistent with the Fundamentals for Rangeland Health[4]; it determines, therefore, that continued management under a similar regime would provide similar results. (A.R. 1944.)

_____

[4]The Fundamentals of Rangeland Health are set out in 43 C.F.R. § 4180.1. Those regulations require "[s]tandards and guidelines developed or revised by a [BLM] State Director . . . must be consistent with" certain narrative criteria for watersheds, ecological processes, water quality, and habitat for certain species. *Id.* The Fundamentals of Rangeland Health are regulations that govern BLM's management but are distinct from NEPA and NEPA analysis. It appears to the Court that, in Idaho, BLM implements the Fundamentals of Rangeland Health through the Idaho Standards for Rangeland Health and Guidelines. *See supra* note 3.

**2.  BLM's Finding of No Significant Impact and Grazing Decisions**

On August 20, 2008, based on the EA, BLM made a finding of no significant impact ("FONSI")[5] and issued proposed decisions to grant grazing permits for the four allotments on August 20, 2008.[6]  (Defs.' Resp./Brief Supp. Cross Mot., at 2, Dkt. No. 27; WWP's Open. Brief Supp. Mot., at 7, Dkt. No. 18-1.)   Those decisions became final, and then Field Manager David Rosenkrance authorized grazing on the four allotments on February 23, 2009 (A.R. 2124 (authorizing grazing on Trail Creek, Meadow Creek, and Grouse Creek)), February 26, 2009 (A.R. 2127 (authorizing grazing on Grouse Creek, Trail Creek, and Rock Creek), March 23, 2009 (A.R. 2129 (authorizing grazing on Grouse Creek and Trail Creek), and April 9, 2009 (A.R. 2133 (authorizing grazing on Grouse Creek)).

**3.  Presence of Bull Trout on Rock Creek Allotment**

Between September 23 and October 16, 2008, about four months before BLM issued the permit for Rock Creek, a BLM fisheries technician conducted a bull trout redd[7]

---

[5]The FONSI appears in each of the Notices of Area Manager's Proposed Grazing Decisions; the Court is unaware of a stand-alone FONSI document.  (A.R. 1959–62, 1992–95, 1975–78, 2007–2010.)

[6]BLM's decision apparently "incorporated actions from Alternatives [One] and [Two] from the EA."  (Defs.' State. of Facts, at 3, Dkt. No. 28.)  Which Alternative BLM's final decision most closely resembles, however, is not critical to this opinion.  As discussed below, the Court finds the EA deficient such that it cannot support any BLM decision.  Further, because the Court  will vacate BLM's decision, BLM will have an opportunity to clearly articulate how its subsequent grazing decision, if any, relates to alternatives analyzed in a supplemented or revised EA.

[7]Female bull trout excavate gravel from the river bottom to create a nest to lay eggs in; this nest is called a redd.  *See, e.g.*, Natural Res. Conservation Serv., Fish and

survey and identified seven (7) redds in the upper Pahsimerioi River, within the Rock Creek Allotment. (A.R. 2041–42.) Then, about nine months later, on July 28, 2009, a BLM fisheries biologist noted

> [a]n error in the Challis BLM fish presence absence [sic] database (2003 data) led to an incorrect conclusion regarding the presence of the bull trout [sic] in the section of the Pahsimeroi River passing through the Rock Creek Allotment . . . . [The biologist] used this result in the fisheries section of the Grouse Creek, Meadow Creek, Rock Creek, and Trail Creek Allotments [EA], believing it was the most current source . . . of information regarding fish presence.

(A.R. 2134.)

A decade earlier, in March 1999, BLM had prepared a "Biological Assessment for Federally Listed Salmonids in the Pahsimeroi River Section 7 Watershed," in order to evaluate the effects on bull trout due to activities in the basin. (A.R. 89, 92.) That Biological Assessment ("BA") determined the Rock Creek Allotment contained "occupied habitat for bull trout." (A.R. 131.)

## 4. WWP's Protest and Administrative Appeal

WWP sent letters to the BLM Challis Field Office protesting the proposed decision. (A.R. 2039.) BLM determined those protests untimely. (A.R. 2039.) On September 23, 2008, WWP filed an administrative appeal challenging the EA, FONSI and decision to issue new permits; WWP also petitioned to stay the decision. (A.R. 2056.) The Department of the Interior's Office of Hearings and Appeals denied WWP's petition for stay on November 4, 2008. (A.R. 2106.) Thereafter, WWP dismissed its

Wildlife Habitat Mgmt. Leaflet No. 36, *Bull Trout (Salvelinus confluentus)* 2–3 (2006), *available at* http://www.fws.gov/oregonfwo/Species/Data/BullTrout/.

administrative appeal (A.R. 2115, 2117), and filed this action (Compl., Dkt. No. 1).

## DISCUSSION

### 1. Applicable Legal Standards

#### A. *Summary Judgment and Judicial Review Under the APA*

Both parties have moved for summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to the judgment sought as a matter of law. Fed. R. Civ. P. 56(c).

The Administrative Procedure Act ("APA") "sets out the standard for judicial review of decisions involving NEPA." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005). The APA directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). The court can only reverse an agency action as being arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise.'" *Lands Council, v. McNair*, 537 F.3d 981, 987 (9th Cir.

2008) (citing *Earth Island Inst. v. U. S. Forest Serv.*,  442 F.3d 1147,1156 (9th 2006).

Generally, courts must be "'at [our] most deferential' when reviewing scientific

judgments and technical analyses within the agency's expertise." *Lands Council v.

McNair*, ___ F.3d ___, 2101 WL 5300804, *3 (9th Cir. 2010).

## B.  *National Environmental Policy Act*

NEPA "is a procedural statute that requires the Federal agencies to assess the

environmental consequences of their actions before those actions are undertaken."

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir.

2004); *see also* 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental

information is available to public officials and citizens before decisions are made and

before actions are taken.").  NEPA requires federal agencies to prepare an environmental

impact statement ("EIS") for "major Federal actions significantly affecting the quality of

the human environment."  42 U.S.C. § 4332(2)(C).

"Where an agency is unsure whether an action is likely to have 'significant'

environmental effects," and thus whether an EIS is required, the agency may first prepare

an environmental assessment ("EA").  *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993.

An EA is "a 'concise public document' designed to '[b]riefly provide sufficient evidence

and analysis for determining whether to prepare an environmental impact statement.'" *Id.*

at 993 (quoting 40 C.F.R. § 1508.9).  If, on the basis of the EA, the agency makes a

finding of no significant impact ("FONSI"), the agency need not prepare an EIS and may

proceed with the proposed action. *Id.* at 993; 40 C.F.R. § 1508.13.

When reviewing NEPA analyses, the APA's arbitrary and capricious standard requires the Court "to ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action." *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 599 (9th Cir. 2010) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (internal quotation marks omitted).

An agency may avoid some detailed discussion in its NEPA analysis "by referring to another document containing the required discussion." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002). This process of incorporation by reference is called "tiering." 40 C.F.R. § 1502.20. An agency may not, however, "tier[ ] to a document that has not itself been subject to NEPA review[,] . . . for it circumvents the purpose of NEPA." *Kern*, 284 F.3d at 1073. In short, "A NEPA document cannot tier to a non-NEPA document." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 998; *see also South Fork Band Council of Western Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) ("A non-NEPA document . . . cannot satisfy a federal agency's obligation under NEPA."); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 811 (9th Cir. 1999) (rejecting an agency's attempt to tier an EIS to a non-NEPA document because "[s]uch reliance is impermissible under the NEPA regulations, which only permit tiering to prior EIS's").

The public and the courts ultimately must defer to BLM's land management

decisions; but NEPA requires "BLM to articulate, publicly and in detail, the reasons for and likely effects of those management decisions, and to allow public comment on that articulation." *Kern*, 284 F.3d at 1073.

### 3. BLM's Motion to Supplement the Administrative Record

BLM moved to supplement the administrative record in this case "to include materials that document the agency's response to its discovery of the mistake regarding bull trout." (Brief Supp. Defs.' Mot., at 1, Dkt. No. 25-4.) BLM asks the Court to consider a new Biological Assessment ("BA") and letters of concurrence relating to that BA. (*Id.*) The Court will address BLM's motion to supplement before discussing the parties' summary judgment motions and the merits of this case.

Judicial review under the APA is usually limited to the administrative record the agency relied upon to make its decision. *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996); *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988). Under certain circumstances, however, a reviewing court may expand its scope of review beyond the record. *Id.* Specifically, the Ninth Circuit recognizes four scenarios that allow for extra-record evidence:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (quoting *Southwest Ctr.*, 100 F.3d at 1450) (internal quotation marks omitted).

Here, none of the four exceptions apply. First, BLM's final decision occurred well before it issued, or received, the materials it now seeks to include; thus BLM's proffered supplement is not relevant to its grazing decisions. Second, precisely because the new materials post-date the decisions, BLM could not have relied, and did not rely, on those materials in reaching its grazing decisions. Third, the new materials might explain complex subject matter, but they certainly cannot excuse BLM's oversight. That is, despite the complexity of bull trout science, BLM's failure to consider bull trout had nothing to do with complexity. BLM simply failed to consider existing data with which it was well acquainted. Finally, the fourth exception relates to agency bad faith; it is thus inapplicable to BLM's motion.

Moreover, even if the Court were to consider BLM's proffered materials, BLM's arguments still fail. NEPA requires public disclosure before agencies make decisions. The public has not vetted BLM's new Biological Assessment or the related letters of concurrence through review and comments as part of the NEPA process. BLM's post-hoc BA cannot save a deficient NEPA analysis and circumvent the public's right to comment on the data upon which the agency uses to reach its decision. Therefore, because BLM's attempt to supplement the record does not meet any of the narrow exceptions that allow for extra-record review, and because BLM's documents would not save a deficient analysis, the Court will deny BLM's motion to supplement the record.

**2. The Parties' Cross Motions for Summary Judgment**

WWP argues that BLM's EA is inadequate because it failed to: (1) take a "hard

look" at impacts on bull trout; (2) consider a reasonable number of alternatives; and (3) analyze cumulative impacts. The Court will address each of these arguments.

## A. *BLM's Consideration of Bull Trout*

WWP claims BLM failed to take the requisite "hard look" at potential impacts on bull trout, an ESA-listed species, because the EA states there are no bull trout on the Rock Creek Allotment. (WWP's Opening Brief, at 11.) According to WWP, BLM's faulty characterization of the "baseline" environmental conditions resulted in a complete failure to analyze impacts on bull trout. BLM therefore could not, and did not, take a "hard look" at any impacts on bull trout. (WWP's Opening Brief, at 11.)

BLM concedes that its EA erroneously omitted bull trout from consideration. (Defs.' Resp./Brief Supp. Cross Mot., at 4.) BLM, however, argues its error was insignificant and therefore harmless. (*Id.* at 5–8.) In support of its position, BLM maintains the EA's consideration of the Westslope cutthroat trout amounted to a proxy for bull trout. (*Id.* at 5.) BLM's EA did not discuss any plan to consider cutthroat as a proxy. Furthermore, BLM acknowledges that bull trout and Westslope cutthroat have varying habitat requirements. (*Id.* at 5–6.) Among those differences are the bull trout's need for colder water and its different spawning season—fall, not spring like Westslope cutthroat. (*Id.*)

BLM also argues that the EA did consider bull trout *habitat* in the Rock Creek Allotment, which BLM asserts was improving. (*Id.* at 6–7.) For support, BLM cites to several studies from the late 1990s and early 2000s. (*Id.*) Some of those studies are

NEPA documents, many are not. (*Id.*) BLM further argues that the EA, and the subsequent decisions, "took action to ensure continued habitat improvement." (*Id.* at 8.) In sum, BLM argues: "Although the EA erroneously stated that bull trout were not present in the Rock Creek Allotment, the agency did consider the proposed decisions' impact on other fish species and on bull trout habitat." (*Id.* at 9.)

Finally, BLM argues that even if its error was not harmless, the agency addressed any potential problems once BLM biologists discovered the error. (*Id.* at 10.) BLM claims it "carefully re-evaluated its decisions and sought and obtained concurrence from the other relevant agencies" that its decision complied with the ESA. (*Id.*)

Nevertheless, BLM's post-hoc rationalizations and after-the-fact studies do not satisfy NEPA's "hard look" requirement for the decisionmaker. BLM records indicate bull trout presence in the Rock Creek Allotment as recently as 1999. Further, a seemingly run-of-the-mill redd survey—which BLM conducted after the EA, but before issuing permits—indicated the actual and continued presence of bull trout. If BLM had taken a "hard look" at its own data and the land under its supervision during the EA process, it likely would have discovered the error in its fish presence database. Moreover, WWP notified BLM of the EA's error regarding bull trout in a reply brief during the administrative appeal process in October 2008. (Ex. B, WWP's Reply/Resp. Brief, Dkt. No. 31-1.) BLM acknowledges as much in its briefing here. (Defs.' Reply Brief, at 2 n.1, Dkt. No. 23.) So BLM had notice of its error—and an opportunity to supplement or revise the EA—before it issued permits, and chose not to do so.

Further, BLM's purported reliance on a previously undisclosed proxy does not satisfy NEPA's mandate for public disclosure; nor can BLM apply data in old reports to justify current management practices. *See* 40 C.F.R. § 1500.1 ("[P]ublic scrutiny [is] essential to implementing NEPA."). BLM's after-the-fact consultation also runs afoul of NEPA's public participation policy. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (discussing, in the EIS context, the importance of agencies informing the public of the basis for decisions and for allowing public comments).

Basically, BLM justifies it error by saying, "no harm, no foul." Yet, irrespective of the potential harm to bull trout, there is another problem here: BLM failed to disclose essential information to the public about BLM's decisions affecting public lands. BLM may have issued the grazing permits even if it had considered bull trout; but, it might not have issued them, or it might have issued permits with different conditions.

BLM cannot make informed decisions if it does not consider all relevant information at its disposal. Nor can the public evaluate BLM's decisionmaking without being fully informed. BLM had notice of, and had ready access to information about, bull trout on Rock Creek. BLM's EA should have considered bull trout in the Rock Creek Allotment. It did not. Because BLM's EA does not take a "hard look" at the impacts of proposed action, or its alternatives, on bull trout, the EA violates NEPA.

**B. *BLM's Alternatives Considered***

WWP also claims BLM's EA failed to consider a reasonable number of alternatives. (WWP's Opening Brief, at 14.) An EA must include a "brief discussion . . .

of alternatives as required by [42 U.S.C. § 4332(2)(E) and] of the environmental impacts" of those alternatives.  40 C.F.R. § 1508.9.  In turn, 42 U.S.C. § 4332(2)(E) directs federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  Thus, "[a]gencies are required to consider alternatives in both EISs and EAs and must give full and meaningful consideration to all reasonable alternatives."  *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dep't of the Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005)).

A court reviewing an agency's range of alternatives must apply a "rule of reason." *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).  A agency need not consider an alternative "whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative."  *Id.* (internal quotation marks omitted).  An agency must "set forth only those alternatives necessary to permit a 'reasoned choice.'"  *Id.* Nonetheless, an agency may not uncritically privilege one form of use over another.  *Ore. Natural Desert Ass'n v. Bureau of Land Mgmt.*, __ F.3d __ , 2010 WL 3398386, at *29 (9th Cir. Aug. 31, 2010).

Here, WWP argues that BLM did not consider a proper range of alternatives. WWP contends "all three alternatives analyzed in the EA—including the 'no action' alternative—propose almost identical livestock grazing levels, varying only in their amount of range projects."  (WWP's Opening Brief, at 15.)  According to WWP, "BLM's

failure to analyze alternative levels of grazing violates NEPA." (*Id.*)

BLM counters that the breadth of alternatives considered was adequate for the situation, such that BLM was able to make an informed decision. BLM argues that all of the allotments at issue "were either meeting the Idaho Standards for Rangeland Health or were making significant progress towards meeting those standards." (Defs.' Resp./Brief Supp. Cross Mot., at 14.) Further, BLM asserts that changing land management practices over the past twenty years led to "very positive results," so continuing "those practices could be expected to further the positive trend." (*Id.*) BLM also argues that it could address resource conflicts through proper livestock management. (*Id.*) Finally, BLM maintains that the land at issue here is "available" for grazing, implying that such a designation mandates it to issue grazing permits. (*Id.*)

BLM states that it considered a no grazing alternative, just not in detail. "This is because . . . the 1999 Challis Range Management Plan still makes the land available for grazing" and "the prior permittees have complied with requirements, and will accept new requirements." (Defs.' Resp./Brief Supp. Cross Mot., at 13 n.5.) The EA does, in fact, contain a subsection entitled "Alternatives Considered but not Analyzed in Detail," which states BLM elected not to consider a "no grazing" alternative because the land use plan authorized grazing. (A.R. 1908.) That section also states, "[i]n accordance with 43 C.F.R. [§] 4130.2(a), the authorized officer shall issue a permit where the land use plan makes it available for grazing." (*Id.*)

The problem with BLM's arguments is that none of them address NEPA's

requirement for meaningful consideration of reasonable alternatives; rather, BLM's EA, and BLM's arguments in support of the EA, evince "precisely [the] sort of 'uncritical [ ]' privileging of one form of use over another that [the Ninth Circuit] has held violates NEPA." *Ore. Natural Desert Ass'n*, 2010 WL 3398386, at *29 (second alteration in original). Moreover, 43 C.F.R. § 4130.2(a), the regulation that the EA purports to rely on for not analyzing a no grazing alternative, offers no support.

First, each of BLM's alternatives included nearly equivalent levels of grazing. Alternatives One and Two included identical grazing numbers; Alternative Three included identical grazing numbers for three of the four allotments. Under Alternative Three, however, grazing levels on the fourth allotment, Grouse Creek, would have been about ten percent less. The three alternatives did include slightly different days of use and variations on the type and extent of range improvements, but those differences are not significant.[8]

Most troubling is that BLM did not consider a real no action alternative. BLM's purported "No Action" Alternative involves grazing; that alternative required agency action through issuing new ten-year grazing permits. If BLM truly did take no action, then the old grazing permits would expire, no new permits would issue, and no range

---

[8]The Court, even after studying BLM's "Grouse Creek, Trail Creek, Meadow Creek, and Rock Creek Alternative Comparison Tables" (Attach. No. 1, Defs.' Object. WWP's State. Facts, Dkt. No. 30-1), is unable to discern any meaningful difference between the three alternatives with respect to total days of use for, or the extent of range improvements for Alternatives One and Two.

improvements would occur. No action would be no action. This is a reasonable, and obvious, alternative to issuing new grazing permits. BLM, however, dismissed a real no action alternative out of hand based on a mistaken understanding of its authority. (A.R. 1908.)

The EA, citing 43 C.F.R. § 4130.2(a), says "the authorized officer *shall* issue a permit where the land use plan makes it available for grazing." (A.R. 1908 (emphasis added).) This completely misrepresents § 4130.2(a). The actual language of that regulation simply explains what grazing permits are:

> Grazing permits and leases authorize use on the public lands and other BLM-administered lands that are designated in land use plans as available for livestock grazing. Permits and leases will specify the grazing preference, including active and suspended use. These grazing permits and leases will also specify terms and conditions pursuant to §§ 4130.3, 4130.3-1, and 4130.3-2.

43 C.F.R. § 4130.2(a). The regulation defines grazing permits and leases and states only that they must include certain terms or conditions; it does not compel an "authorized officer," or anyone else, to issue a permit. The regulation does not direct BLM to preference grazing over no grazing; nor does it require BLM to maintain grazing levels from an expiring permit, rather than reduce levels, if BLM issues a new permit. To the extent § 4130.2(a) references land use plans, it does so to indicate which public lands BLM *may* issue grazing permits for.[9] 43 C.F.R. § 4130.2(a) does not excuse BLM from

---

[9]The Notices of Area Manager's Proposed Grazing Decisions also purport to quote 43 C.F.R. § 4130.2(a) as a basis of authority for the decisions:

considering a no grazing alternative.

The alternatives BLM analyzed were all reasonable, given the purpose and need for the Proposed Action. There was, however, at least one more reasonable alternative: a no grazing alternative. It is also eminently reasonable that BLM should have considered an alternative that significantly reduced grazing levels from previous permits. Neither a no grazing or reduced grazing alternative is remote or speculative. Furthermore, BLM

---

The authority under which this decision is made is found within the following 43 CFR citations [sic]:
. . .

4130.2(a)    Grazing permits or leases[:] 'Grazing permits or leases shall be issued to qualified applicants to authorize use on the public lands and other lands under the administration of Bureau of Land Management that are designated as available for livestock grazing through land use plans.'

(A.R. 1970–71, 1988, 2002–03, 2016 (original quote in italics).) For the reasons discussed above, this is appears to be a gross misrepresentation of the actual text of 43 C.F.R. § 4130.2(a).

For the most part, BLM's Notices of Area Manager's Proposed Grazing Decisions correctly cite the regulatory authority for grazing decisions. The Court, however, is unable to find an obvious reason for BLM's misquote of § 4130.2(a). The Court has ruled out a mistaken citation. The Court could not locate *any* regulation with the quoted language that BLM attributed to 43 C.F.R. § 4130.2(a). This is concerning, to say the least, because BLM's otherwise correct citations indicate its familiarity with the grazing regulations. BLM's misrepresentation of § 4130.2(a) causes the Court to question if BLM fully comprehends its discretion to grant—or not grant—grazing permits.

BLM has broad authority to manage public lands as it sees fit, as long as it does so within the confines of its statutory mandates and regulatory authority. BLM may readily issue grazing permits under the rules as written; it also may decide not to grant permits in appropriate situations. BLM need not, nor should it, try to support its decisions with misstatements of law.

could have reasonably ascertained the effects of a no grazing and a reduced grazing alternative. BLM misstated its own regulations to justify its failure to consider a no grazing alternative; and BLM gave no rationale for neglecting to consider a reduced grazing alterative.

Public land management is a difficult task and fraught with competing interests. One of BLM's goals is to maintain and improve rangeland health. The "rule of reason" therefore dictates that BLM should have analyzed a no grazing alternative, or a reduced grazing alternative, or both, before issuing grazing permits. BLM's regulations certainly do not foreclose those alternatives. Accordingly, because BLM's EA only considers three nearly equivalent alternatives and nothing else, the EA violates NEPA.

In reaching this conclusion the Court does not suggest that BLM must address every possible alternative. Instead, BLM must apply a "rule of reason" in selecting alternatives such that it allows the decisionmaker to consider something other than grazing levels that are substantially the same levels as recent historical permits. Once the decisionmaker has the complete picture, he or she may then decide whether to issue new permits, and the appropriate grazing levels authorized by those permits.

### C. *BLM's Cumulative Impacts Analysis*

WWP also claims BLM's EA is deficient for failing to adequately analyze cumulative impacts. An EA must "fully address cumulative environmental effects or 'cumulative impacts.'" *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (citing *Kern v. Bureau of Land Mgmt.*, 284

F.3d 1062, 1076 (9th Cir. 2002). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. An EA must include "a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects" might impact the environment. *Te-Moak Tribe*, 608 F.3d at 603 (internal quotation marks omitted).

An EA's cumulative impacts analysis must include more than general statements about possible effects or risks; the agency must take a "hard look" at cumulative impacts or explain why it cannot. *Te-Moak Tribe*, 608 F.3d at 603. "[S]ome quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." *Te-Moak Tribe*, 608 F.3d at 603 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998)) (internal quotation marks omitted) (alterations in original).

WWP argues that BLM failed to analyze the impacts the challenged grazing permits would have when combined with past, present, or future impacts on other allotments in the area. Specifically, WWP contends "BLM never assesse[d] the cumulative impacts on wildlife that the four decisions [at issue here] will have on the 45,000-acre area" that the allotments comprise. (WWP Opening Brief, at 17.) WWP

maintains the EA does not include any "quantified or detailed information" about

cumulative impacts, nor any rationale for omitting such information. (*Id.*) Further, WWP

claims that "BLM failed to catalogue or analyze the impacts of other past and reasonably

foreseeable actions in the area." (*Id.*) According to WWP, BLM recently issued new ten-

year grazing permits for the Burnt Creek Allotment, which borders Rock Creek, (*Id.*); and

BLM is proposing to issue grazing permits for allotments adjacent to Grouse Creek,

which connect Grouse Creek to Rock Creek. (*Id.*)

BLM counters that "[g]iven the fact that the allotments were either meeting the

standards for rangeland health . . . or making significant progress towards meeting those

standards, [WWP's wildlife] argument fails." (Defs.' Resp./Brief Supp. Cross Mot., at

19.) BLM further contends that it addressed past and reasonably foreseeable future

actions when it discussed changing land management practices that it implemented in

1993. (*Id.*) BLM argues the success of those management practices provide that "one

would expect few negative, cumulative impacts. And, indeed, that is what the agency

determined." (*Id.*)

Yet NEPA requires more. An EA must show the big picture through its

cumulative impacts analysis. BLM must take a "hard look" at potential cumulative

impacts; its generalized statements and suppositions are not enough. BLM's EA

acknowledges potential harm to wildlife on individual allotments, but the EA does not

provide any "quantified or detailed information" about the cumulative impact on wildlife

that might result from issuing permits for all four allotments. Nor does the EA include "a

sufficiently detailed catalogue of past, present, and future" actions on neighboring allotments. BLM manages much of the Pahsimeroi valley for grazing, as does the Forest Service. It is therefore likely, as WWP claims, that permits for other allotments recently have issued or soon will issue. The EA does not address those concerns.

BLM might be correct that compliance with the Idaho Standards of Rangeland Health will mitigate any cumulative impacts in the valley. BLM may not, however, rely on the conclusions of rangeland health assessments without including actual observations and analysis in the EA. BLM's rangeland health assessments are not NEPA documents. A NEPA document cannot tier to—*i.e.* cannot incorporate by reference—a non-NEPA document. BLM may draw on data from its rangeland health assessments, but it must provide that data and the accompanying analysis in its EA. BLM's rangeland health assessment process may complement NEPA; it does not displace NEPA's requirement that BLM take a "hard look" at the cumulative impacts of a proposed action.

For example, after a brief discussion of ongoing and planned rangeland health assessments, the EA states, "The proposed action would allow for the continuation of significant progress toward meeting the rangeland health standards within the Pahsimeroi Valley." (A.R. 1935.) Yet rangeland health assessments are not conducted pursuant to NEPA and the "meeting or are making significant progress toward" criteria is specific to BLM's Fundamentals of Rangeland Health regulations and standards. *See* 43 C.F.R. § 4180.1; Bureau of Land Mgmt., U.S. Dep't of the Interior, *Idaho Standards for Rangeland Health and Guidelines for Livestock Grazing Management FINAL* 3 (1997).

BLM defines "Significant Progress" as "Measurable and/or observable (*i.e.*, photography, use of approved qualitative procedures) [sic] changes in indicators that demonstrate improved rangeland health. Bureau of Land Mgmt., U.S. Dep't of the Interior, *Idaho Standards for Rangeland Health and Guidelines for Livestock Grazing Management FINAL* 17 (1997). This phrase has no meaning under NEPA. Nor does BLM's EA even direct a reader to the definition; the Court, through its own research, found BLM's glossary.

For BLM to conclude that its "proposed action would allow for continuation of significant progress toward meeting the rangeland health standards"—and comply with NEPA—BLM must do more. BLM must discuss what the rangeland health standards are; it must define what "meeting or making significant progress toward" those standards means; and it must explain, with data and analysis, why it reached its conclusion. Furthermore, BLM must explain how its analysis and conclusions comports with NEPA's requirement to take a "hard look" at the proposed action in conjunction with past, present, and reasonably foreseeable future actions. BLM's rangeland health assessments could likely provide the best available data for the allotments. That data may also justify BLM's conclusions. NEPA, however, requires BLM to disclose its data and its analysis in its NEPA documents so BLM's decisionmakers and the public can review it, critique it, and comment on it.

Here, the EA does not "cite[ ] other agency's documents merely to support and substantiate its analysis and assessment of rangeland conditions." (Defs.' Reply Brief, at

6, Dkt. No. 35.)  In fact, the EA offers no real analysis about cumulative impacts; instead, it makes conclusory statements and refers to the rangeland health assessments for support. BLM's EA simply does not show the big picture.  Neither BLM, nor the public, can readily discern, from the EA, the impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions.  Therefore, because the EA does not adequately address cumulative impacts, it violates NEPA.

## CONCLUSION

The Court acknowledges that it should not substitute its judgment for the scientific and technical expertise of federal agencies.  However, there must exist some checks and balances in the judicial review process to ensure that federal agencies are complying with the procedural requirements when considering the environmental impacts of certain decisions.  Even acknowledging the BLM's scientific and technical expertise is evaluating whether or not grazing should be allowed on public lands, the Court finds in considering the totality of the circumstances regarding the grazing permits in this particular case that the BLM violated NEPA because it improperly tiered to non-NEPA analysis and the EA fails to analyze bull trout on Rock Creek, consider a reasonable number of alternatives, and/or analyze cumulative impacts.  BLM thus failed to consider several important relevant factors in reaching its final decision to allow certain grazing permits and failed to allow the requisite public participation in the process, evincing a clear error in judgment.   BLM's grazing decisions for the allotments are therefore arbitrary, capricious, and not in accordance with law as this Court cannot determine that

the BLM compiled with NEPA by taking a "hard look" at the environmental consequences of the proposed action. Accordingly, the Court will grant WWP's motion for summary judgment, and deny BLM's cross motion for summary judgment. Additionally, the Court will deny BLM's motion to supplement because none of the extra-record review exceptions apply, and, in any event, BLM's proffered materials cannot rectify the faulty NEPA analysis.

Because BLM's grazing decisions were arbitrary and capricious, the Court will set aside those decisions. The four grazing permits based on those decisions are therefore invalid. However, the Court recognizes that the grazing permit holders likely relied, to their detriment, on BLM's decisions. So in the interest of equity, the Court will order BLM to allow grazing consistent with the invalidated permits' terms and conditions, except for improvements that have not been completed, for up to one year.

With this remedy, the Court seeks to hold BLM accountable for their land-management responsibility without unduly burdening the affected permittees. The Court determined that a one-year time frame provides BLM sufficient opportunity to revise or supplement its NEPA analysis, consider public comments, and reissue decisions. By granting this reprieve, the Court does not intend to imply, in any manner, what decision BLM should reach if and when it completes a proper NEPA analysis. Rather, the Court seeks only to allow the permittees some additional time to plan for future operations in light of this decision, while maintaining limited grazing in the project area.

In issuing this opinion, the Court is mindful of the need for, and impacts of,

livestock grazing on public lands. However, BLM must make any decisions about grazing levels within the parameters of the applicable law. NEPA requires BLM decisionmakers to take a "hard look" at the environmental impacts of their decisions; it does not allow BLM to rubber stamp applications in order to maintain the *status quo*. Citizens rely on BLM to manage public lands for multiple, often competing, uses. The public interest therefore demands that BLM follow the law; and the law requires BLM to accept and consider public comments, and make fully informed decisions. When, as here, BLM disregards the law, it disregards the public interest and undermines its own credibility.

## ORDER

Based on the foregoing, and the Court being fully advised in the premises,

**IT IS ORDERED** that

1.  Plaintiff Western Watershed Project's Motion for Summary Judgment (Dkt. No. 18) is **GRANTED**.

2.  Defendants David Rosenkrance and the Bureau of Land Management's Cross Motion for Summary Judgment (Dkt. No. 26) is **DENIED**.

3.  Defendants David Rosenkrance and the Bureau of Land Management's Motion to Supplement the Record (Dkt. No. 25) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' grazing decisions following the provisions as described in Environmental Assessment #ID-330-2007-3268 are

**VACATED**. In the interest of equity, grazing may continue consistent with the terms and conditions of the grazing permits bearing authorization numbers 1102588, 1104031,

1104047, and 1101840 until January 5, 2012; in no event shall grazing contemplated in Environmental Assessment #ID-330-2007-3268 occur after that date, unless such grazing is pursuant to other validly issued permits or a further extension of the deadline is extended by order of the Court. No range improvements contemplated in Environmental Assessment #ID-330-2007-3268 shall be made, including those improvements begun, but not yet completed.

**IT IS FURTHER ORDERED** that Defendants shall make every effort to protect bull trout and bull trout habitat on the Rock Creek Allotment from livestock grazing that occurs in accordance with this order. In crafting bull trout protection measures, Defendants shall incorporate any information that resulted from recent surveys, studies, and consultation with other agencies.

DATED: January 5, 2011

~~Honorable~~ Edward J. Lodge
U. S. District Judge